DEPARTMENT OF DRIVER SERVICES, SECRETARY OF STATE, STATE OF ILLINOIS, Plaintiff-Appellee, v. SECRETARY OF STATE MERIT COMMISSION, STATE OF ILLINOIS, Defendant (Earl Smock, Defendant-Appellant).

Fourth District   No. 4—84—0042

Opinion filed May 6, 1985.—Rehearing denied June 4, 1985.

GREEN, P.J., dissenting.

Manion, Janov, Edgar, Devens & Fahey, Ltd., of Hoopeston (Paul T. Manion, of counsel), for appellant.

Stratton & Nardulli, of Springfield, for appellee.

JUSTICE TRAPP delivered the opinion of the court:

Defendant Smock appeals from an order of the circuit court of Sangamon County, sitting in administrative review (Ill. Rev. Stat. 1983, ch. 110, par. 3—101 et seq.), which reversed the order of the Secretary of State Merit Commission of the State of Illinois (Commission) suspending him from his position with plaintiff Department of Driver Services of the Illinois Secretary of State (Department) for 90 days. This suspension was in addition to a suspension previously imposed by the Department, and constituted the maximum suspension the Commission could permissibly impose under section 9 of the

Secretary of State Merit Employment Code (Ill. Rev. Stat. 1983, ch. 124, par. 109). The circuit court ordered Smock's discharge from employment consistent with the Department's position. The discharge order has been stayed pending this appeal.

The issue before this court is the propriety of the circuit court's reversal of the Commission's decision.

The guidelines have been stated by the supreme court in *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (DuFrenne, appellant) (1981), 85 Ill. 2d 547, 426 N.E.2d 885. The court described a two-step process for a reviewing court in dealing with an administrative agency's (here, the Commission's) decision whether or not to discharge an employee: (1) to determine whether the agency's findings of fact are contrary to the manifest weight of the evidence, and (2) to determine whether the findings of fact provide a sufficient basis for the conclusion that cause for discharge does or does not exist. The latter is not tested by manifest weight of the evidence, but whether the decision is arbitrary, unreasonable, or unrelated to the requirements of the service. *Sutton v. Civil Service Com.* (1982), 91 Ill. 2d 404, 438 N.E.2d 147; *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (Mars, appellant) (1982), 103 Ill. App. 3d 954, 431 N.E.2d 1330; *Secretary of State v. Kunz* (1983), 116 Ill. App. 3d 736, 739, 452 N.E.2d 387, 389.

Section 11 of the Personnel Code prohibits the discharge of employees except "for cause." (Ill. Rev. Stat. 1983, ch. 127, par. 63b111.) There is no statutory definition of "cause." "Cause" has been judicially defined as " 'some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public policy recognize as good cause for his no longer holding the position.' " (*Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (DuFrenne, appellant) (1981), 85 Ill. 2d 547, 551, 426 N.E.2d 885, 887.) As this court stated in *Parkhill v. Illinois Civil Service Com.* (1978), 58 Ill. App. 3d 291, 292, 374 N.E.2d 254, 256, such shortcoming need not be directly connected with the performance of the work; however, it must not be trivial, arbitrary, or unreasonable. The question of whether cause for discharge exists should be determined by the administrative agency (here, the Commission), and the agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service. *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (DuFrenne, appellant) (1981), 85 Ill. 2d 547, 426 N.E.2d 885.

With these general precepts in mind, we consider the facts which were before the Commission in rendering its determination on the issue of cause for discharge in this case.

In the case at bar, the first step is not controverted. The parties do not contest the findings of fact nor that the charges against Smock were proved. Hence, the second step of the analysis is the determinative issue in this case.

Smock supervised the Department's driver facility in Hoopeston. During the requisite time period, the staff of the small facility included Mr. Bane from October 1974 through May 1979, Ms. Parsons beginning in May 1978, and Ms. Shore beginning in September 1974. Smock worked at the facility as an examiner beginning in 1974, and was promoted to the position of supervisor in June 1976. Smock also served as mayor of Hoopeston and chairman of the Vermilion County Democratic party.

On June 15, 1981, the Department initiated discharge proceedings against Smock following a 29-day suspension from May 19 to June 16, 1981. The charges (1) alleged operation of a city office from the Department's facility during business hours, including installation of a city phone at the facility and conduct of political affairs there during business hours; (2) alleged operation of a political office from the Department's facility during business hours, including installation of a political headquarters' phone at the facility, conduct of political affairs and registration of voters there, attendance at political meetings on State time, and maintaining a political file at the facility; and (3) misuse of State employees in conducting city and political business on State time.

As no specific rules of conduct were placed in evidence, the hearing officer considered Smock's alleged conduct as against general standards of reasonableness and the specific prohibitions of "An Act to define and regulate political activity by merit employees of the State and to repeal an Act herein named" (Act) (Ill. Rev. Stat. 1983, ch. 24½, pars. 38s through 38v).

The hearing officer found that the evidence proved 12 allegations of the bill of particulars filed in support of the Department's charges.

First, around December 21, 1979, a telephone line registered to the political party was installed in Smock's office at the Department facility. This line was answered by State employees on State time per Smock's instructions. (According to the testimony, employees were directed to answer this phone "Vermilion County Democratic chairman's office.") This phone line was removed around November 10, 1980. Second, around March 9, 1978, a phone line registered to the

mayor's office was installed in Smock's office at the Department facility. Department employees answered this phone on State time at Smock's direction. (According to the testimony, employees were directed to answer this phone "the Mayor's office.") This phone line was removed around April 22, 1981. Mr. Graves, Smock's superior, testified the line was removed after he learned of its existence when Hoopeston police were picketing the Department facility. The hearing officer opined that installation of these phone lines went well beyond the realm of reasonableness in keeping personal business from interfering with that of the Department, and that Smock knew that he was not to use State employees to conduct personal business, as he had previously been disciplined for such conduct. Smock testified that he had previously been suspended for one week without pay for use of a State employee for non-Secretary of State business.

Third, from around May 3, 1977, until January 6, 1981, when removed by another employee, Smock maintained political files in the Department facility. The hearing officer found that the political files were maintained by Department employees at Smock's order, and that a number of the documents, typed by facility employee Parsons, contained violations of the Act.

Fourth, with regard to a motorcycle purchased to be raffled for the benefit of the Vermilion County Democratic party, between May 30, 1980, and July 16, 1980, Smock sold, and ordered facility employees Shore and Parsons to sell, raffle tickets at the facility on State time for the benefit of the political party. The hearing officer found this was a clear violation of the Act.

Fifth, around Saturday, March 21, 1981, Smock ordered facility employee Shore to appear at his house to stuff envelopes with materials related to political or mayoral activity on State time. The hearing officer found that this amounted to a blatant abuse of authority and a violation of the Act.

Sixth, around April 19, 1981, Smock ordered facility employee Shore to handwrite a letter regarding a precinct committee meeting and make photocopies of it on State time. The hearing officer found that this was a clear violation of the Act.

Seventh, in April 1981, Smock sent a facility employee, Shore, to photocopy jingles to be used by political callers for the upcoming election. The hearing officer found this was abuse of authority over a subordinate.

Eighth, during the week of March 30, 1981, Smock ordered facility employees Shore and Parsons to write "Sorry I missed you" on the back of his political and mayoral brochures on State time at the

facility. The hearing officer found that this was both an abuse of authority and a violation of the Act.

Ninth, Smock ordered facility employee Parsons to type political and mayoral material for him at the facility using State equipment and on State time, of which more than a dozen examples were placed into evidence. The hearing officer found this was an abuse of authority and that some of the documents were in violation of the Act.

Tenth, while at the facility and during office hours, Smock sold facility employee Shore a "silver card" dated 1979 for a $25 contribution to the Democratic party. The hearing officer found this was a violation of the Act.

Eleventh, around March 28, 1978, Smock ordered facility employee Shore, while at the facility and on State time, to prepare a list of Democratic precinct committeemen. The hearing officer found that Smock's admission that he had asked Shore to prepare such a list on her "comp" time sufficiently substantiated Shore's testimony so as to support Smock's guilt of this allegation.

Twelfth, around October 7, 1980, Smock ordered facility employee Parsons to go to Shore's home to process a voter registration on State time. The hearing officer found this appeared to be an improper use of a State employee.

In addition to the above, several facts as found by the hearing officer, whose findings were affirmed by the Commission, are noted. First, according to the testimony, it was not unusual for there to be periods of the day when no patrons were present at the facility, and usually personal and political activities were conducted during the slack periods. Second, Parsons testified she was specifically told that if anyone approached her desk, she should open a drawer and put all the political work she was doing in the drawer, so that no one was to see the political work that she was doing at the facility. Third, Shore testified that in 1978, when Parsons complained she was doing more political and personal work than Department work, and that Springfield would not know she was working at the facility, Smock told Shore to place Parsons' employee number into the computer on about every fourth application to show Parsons as having processed such applications. Shore followed these instructions for a time, later stopping because she was afraid they would be caught if someone complained about a mistake on a driver's license.

In addition, the testimony shows that when Smock was questioned about whether he sold Shore the "silver card" for the Democratic party at the facility, he answered "It could be and it could not. It was her job, too, so whether—whether she bought it on state time I don't

remember."

On November 23, 1981, the hearing officer found that, in the acts proved, Smock had violated the standard of reasonableness in the conduct of his personal affairs *vis-a-vis* those of the Department, and/or the prohibitions of the Act, and that he had involved his subordinates in such activities. The hearing officer rejected Smock's denial of having ordered the participation of subordinates in the activities, stating that a superior's request is normally deemed to be an order. Further, the hearing officer noted an incident wherein Smock had apparently "made life miserable" for employee Parsons after her refusal to type a political letter for him.

The hearing officer concluded that Smock's conduct shown in the record reflected (1) an unreasonable attempt to conduct personal and political business in conjunction with his duties as a Department employee, and (2) coercion of subordinates to assist in these activities. The hearing officer ruled the activities both numerous and blatant enough to warrant Smock's discharge.

In December 1981, the Commission remanded the cause to the hearing officer for a further hearing on the proposed penalty, which was conducted on December 29, 1981. According to the facts as found by the hearing officer, the daughter of facility employee Shore had worked at the facility for several days in December 1979 and January 1980 while the office was open to the public, stuffing envelopes and typing political campaign material. She received payment from the political organization through a check signed by Smock. Facility employees Parsons and Shore testified that during the 1980 judicial election period, after Smock failed to complete a candidate's petition earlier, Smock directed them to sign the petition right- and left-handed with names he read from the telephone directory. Smock kept political funds in the facility safe, with employees depositing such funds to personal or political party bank accounts. Smock testified in his own behalf that he had had a small business in Hoopeston for about 28 years, had been acting postmaster for about 3½ years, a sales tax investigator for about three years, and, for the past eight years, manager of the Hoopeston driver's facility. He had served on the Vermilion County Board of Review for 11 years, was a member of the Jaycees and the Lions, president of the Danville Chamber of Commerce, and had served on the United Fund and March of Dimes committees as well as other activities. In addition, the testimony of area citizens was offered in Smock's support. Smock had no recollection of the nominating petition which Parsons and Shore testified about.

Several additional matters of evidence are noted. First, the De-

partment's performance evaluations on Smock were received into evidence. The evaluations, which had been completed prior to the April 1981 discovery of the Hoopeston mayor's office telephone line into Smock's Department office, rated him as meeting or exceeding expectations in specified categories. (Performance reports of June 16, 1974, to January 8, 1975; January 8, 1975, to May 31, 1976; August 8, 1975, to October 1, 1977; October 1977 to June 1979; and October 1979 to June 12, 1980, wherein supervisor said Smock was "continuing to do a fine job.") The last evaluation, covering the period from June 1980 to June 1981, not participated in by Smock, rated Smock for the first time as needing improvement in the categories of productivity, use of time, human relations, and leadership, as meeting expectations in other categories, and exceeding expectations in no category. Second, Mr. Graves, Smock's Department supervisor, acknowledged that about four years earlier, the supervisor of the Pontiac facility had complained about an examiner working for the station who was mayor, where persons were coming in and calling in to see the examiner in his mayoral capacity. Graves had reported it to his office and the examiner had thereafter, apparently, been able to eliminate the interference of his mayoral function with his Department position. Asked whether he knew that the examiner had received a three-day suspension for employee abuse at the time of his conflict as mayor of Pontiac, Graves answered that he had not known it but his supervisor had made him aware of it. Third, we note the following exchange when Smock was questioned as an adverse witness:

"Q. And isn't it a fact that whenever you were expecting a visit from [Department officials] from Springfield, you ordered the girls to clean up from public view any and all political or mayoral artifacts that were—

A. In the first place, I'd answer no because you have no way of knowing when anybody is coming. And as to your second question, it wasn't only for that, it was for anybody. We went over that once before, too. That this is not to be out before the public, whether it be [a Department official] or John Doe that walked in the door. So it had no—it made no difference ***."

The hearing officer, in a report of February 8, 1982, stated by way of analysis:

"The evidence presented by [Department] at the hearing on aggravation and mitigation indicated that [Smock] had used both the Secretary of State premises and Secretary of State employees for more political activities than those for which he

was charged and found guilty. The evidence also tended to show that [Smock] made some attempt to prevent his superiors from knowing of these activities. The evidence garnered from all of the hearings proved that [Smock] had indeed turned the Hoopeston Drivers facility into a 'mini' political party headquarters.

Many upstanding citizens of the Hoopeston area testified for [Smock] in mitigation. They spoke highly of him as an individual and spoke highly of his civic concerns and activities. The Hearing Officer has no doubt that [Smock] is a fine member of the community and has nobly performed his civic duties. This does not mitigate his abuse of his position with the Secretary of State, and in no way excuses the activities which occurred at the facility under his supervision."

The hearing officer noted that Smock had previously been issued a suspension for using a State employee for his personal business, and that most of the incidents of which Smock was found guilty involved illegal and unauthorized use of State employees. The hearing officer concluded that the magnitude and quantity of the proved offenses warranted discharge.

On March 9, 1982, the Commission met and found the charges proved, but split two-to-one on the appropriate penalty. The majority held that the charges warranted only a 90-day suspension in addition to that previously imposed by the Department, with the Commission's chairman concluding that the charges warranted Smock's discharge from his position with the Department.

On March 11, 1982, the Department filed this action in administrative review, seeking to reverse the Commission's decision. On April 5, 1982, defendant Smock filed an answer and a counterclaim which was subsequently dismissed on May 7, 1982. After the filing of briefs and argument on March 7, 1983, the case was remanded to the Commission by a court order of March 11, 1983, so that the Commission could articulate the basis for its decision of March 9, 1982. On April 18, 1983, the Commission majority issued a modified decision, which inserted the following paragraph:

"Because there was no evidence of a poor work record, and [Smock] had an excellent group of character witnesses attesting to his value to the community, we determined that his good record should to some extent offset his wrongful conduct."

This decision of the Commission was filed with the circuit court on June 15, 1983. After hearing argument on October 26, 1983, the court, by order filed October 31, 1983, found that the Commission's

action in ordering Smock suspended for a period of 90 days rather than ordering discharge was arbitrary, unreasonable, and unrelated to the requirements of service. The court, therefore, ordered Smock's discharge from his employment with the Department.

On November 15, 1983, defendant Smock filed a motion to vacate the judgment order, or, in the alternative, requesting the court to enter an order staying enforcement of its discharge order pending appeal. On December 22, 1983, the trial court denied defendant's motion to vacate the previous judgment, and stayed the judgment of dismissal pending Smock's appeal. This appeal followed.

Defendant Smock maintains that the Commission's decision to suspend rather than discharge him was not arbitrary, unreasonable, and unrelated to the requirements of service, as found by the circuit court, and it must be reinstated. (*Secretary of State v. Kunz* (1983), 116 Ill. App. 3d 736, 452 N.E.2d 387; *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (Mars, appellant) (1982), 103 Ill. App. 3d 954, 431 N.E.2d 1330.) He asserts that, although certain of his activities were clearly forbidden under law and the rules of the Secretary of State, since they would not have been unethical, immoral, illegal, or improper if performed outside the Department facility, they were not of such a nature as to make discharge the only appropriate penalty. He contends that facility customers were not inconvenienced or affected by his activities and, as the activities had no effect on service rendered at the facility, it cannot be said that his discharge is necessitated by the "requirements of service." Similarly, he argues that the Commission's decision to suspend rather than discharge him cannot be said to be arbitrary or capricious, as the record contains evidence supporting the analysis upon which this choice of penalty rested, *i.e.*, a lack of poor work record, an excellent group of character witnesses, and the Commission's determination that his good work record should to some extent offset his misconduct. He further claims that the fact that he violated the Act does not require his discharge, citing *Kunz* and DuFrenne. As additional authority in support of his position, defendant cites *Department of Labor v. Chaney* (1984), 122 Ill. App. 3d 197, 460 N.E.2d 820.

There is no significant contention that the charges were not proved. The standard of judicial review of administrative decisions in this category of cases and the issue presented here is whether the sanction of suspension imposed by the Commission is arbitrary, unreasonable, or unrelated to the needs of the service.

The employee, Smock, makes no claim that the sanction is arbitrary or unreasonable. Upon the argument of the Secretary that the

sanction is unreasonable and unrelated to the needs of the service, we note that the two-to-one vote of the members of the Commission reflects differing views of the conduct of the employee and that each view has some support under the evidence of record.

Extensive examination of precedent in this State discloses no instances where there has been an ultimate judicial reversal of the order of the Civil Service Commission on the ground that the Commission had failed to impose the sanction of discharge. On the contrary, the precedent of judicial opinions discloses that decisions of the Commission to discharge have been reversed where the charges proved were "so trivial as to be unreasonable or arbitrary." See *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (DuFrenne, appellant) (1980), 86 Ill. App. 3d 1072, 1074, 408 N.E.2d 775.

In the latter case, the employee was charged with the use of unnecessary force when he struck a patient of a mental hospital. The Commission noted the mitigating circumstances of extreme provocation and ordered the suspension of the employee. Under administrative review, the circuit court ruled that, as a matter of law, the conduct of the employee required his discharge. The appellate court affirmed the circuit court, but the supreme court reversed the judicial orders, noting that the Commission had found the employee's performance to be satisfactory prior to the conduct which was charged, and the Commission had further found that under such circumstances, the conduct did not show sufficient cause for discharge, with the result that the supreme court could not say that the sanction was unreasonable, arbitrary, or unrelated to the needs of the service.

The legislature has placed the function of the discipline of State employees in the administrative department, both as to establishing the standards and requirements of the service, and as to the sanctions imposed when violations are found. The courts have no role as a superior commission, and the question of whether cause for discharge exists is to be determined by the administrative agency. In *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (DuFrenne, appellant) (1981), 85 Ill. 2d 547, 552, 426 N.E.2d 885, 887, the opinion expressly stated:

> "We therefore hold that the agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service."

In *Department of Labor v. Chaney* (1984), 122 Ill. App. 3d 197, 460 N.E.2d 820, the employee was charged with receiving unauthorized unemployment benefits. Upon hearing of the charges, the Commission

ordered suspension of the employee. The trial court reversed the order of the Commission and ordered discharge. The appellate court reversed the trial court and affirmed the Commission's order of suspension. That opinion concluded that the finding of the Commission that there had been an uneven application of an unwritten departmental policy "[so that the court could not] say that the Commission, in opting for a 90-day suspension rather than discharge, acted unreasonably or arbitrarily, or selected a type of discipline unrelated to the needs of the service." *Department of Labor v. Chaney* (1984), 122 Ill. App. 3d 197, 203, 460 N.E.2d 820, 823.

In *Secretary of State v. Kunz* (1983), 116 Ill. App. 3d 736, 452 N.E.2d 387, there was proof of charges that the supervisor of a driver license facility had slept during the business hours and violated certain regulations of the department. The Commission ordered the sanction of suspension and upon administrative review, the circuit court affirmed the Commission. The appellate court affirmed the circuit court, pointing out that under the Administrative Review Act, it was not the function of the judiciary to conduct a trial *de novo* or to substitute its judgment for that of the administrative agency in determining the proper sanction. Pointing out the deference which the courts accorded the sanction imposed administratively the opinion stated:

"In a broad sense, it is the civil counterpart of the deference which a reviewing court must pay to a trial court's criminal sentence. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541." 116 Ill. App. 3d 736, 739, 452 N.E.2d 387, 390.

Here, as is shown by the divided vote of the members of the Commission, views as to the proper sanction for the employee conduct may differ. There was an administrative conclusion of mitigating circumstances that Smock's work record was well regarded in his department and there was administrative recognition of the employee's desirable public standing within the community. However the merits of the conclusion of the majority of the Commission may be viewed, this court cannot say from this record that the order of the Commission is arbitrary, unreasonable, and unrelated to the needs of the service.

For the reasons stated, the order of the circuit court which reversed the order of the Commission is reversed; the order of the Commission is affirmed; and the cause is remanded to the Commission.

Reversed; remanded to the Commission.

MILLS, J., concurs.

PRESIDING JUSTICE GREEN, dissenting:

I conclude that the "requirements of the service" necessitate that the employee be discharged. Accordingly, I would affirm the decision of the circuit court.

The violations were severe and of a nature that are likely to be committed, as here, by an able person of excellent character who is also very loyal to his or her political party organization. If the admirable qualities of the offender are permitted to have substantial mitigating weight, it will be difficult to deter similar conduct. Where the conduct has continued after reprimand, the employing State agency should be permitted, as a matter of law, to discharge the employee.